IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| SCIENTIFIC GAMES INTERNATIONAL, INC., | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| vs. | : | NO. 2:16-cv-00142-WCO |
| BRIAN KEITH CASH, | : | |
| Defendant. | : | |

**ORDER**

## I. Introduction

This case is before the court on plaintiff Scientific Games International, Inc.'s ("SGI") motion for preliminary injunction and motion for protective order [58]. The court will address each motion in turn, beginning with a brief summary of the relevant facts in issue.

## II. Factual Background

Forty-six states in this country operate government-sponsored public lotteries. (*See* Pl.'s Ex. 407, Schulz Decl. ¶ 27.) To properly administer one of these lotteries, the governmental authority in a given state often contracts with private gaming companies and vendors to perform various support services. Barring some historic relationship with the state, however, each company typically has the opportunity to

submit a bid on available contracts. The bidding process can be very competitive, and some companies excel at particular services. Due to these differing capabilities, lottery service contracts within a single state are commonly divided between multiple gaming companies. *Id.* ¶ 30.

Services typically provided on a lottery contract can include, *inter alia*, systems management and ticket printing. *Id.* ¶ 29–30. The first of these, systems management, involves facility and operational services that enable a lottery to function and is described as the central "infrastructure" of a lottery. *Id.* ¶ 29. The second, ticket printing, involves production needs but can also, depending on the contract, incorporate other functions like warehousing, distribution, sales, and marketing of the product. *Id.* ¶ 30.

Plaintiff SGI is one of the major players in the global lottery and regulated gaming industries. (Second Am. Compl. ¶¶ 10–11.) The company enjoys particular prominence with respect to "instant-lottery" products and services. *Id.* Instant lottery tickets are distinguishable from a traditional draw lottery in that they supply inputs for the purchaser (e.g., numbers or symbols) and may be verified immediately upon purchase. (*See* Pl.'s Ex. 407, Schulz Decl. ¶ 28.) These instant tickets come in a broad assortment and are commonly referred to as "scratch offs." *Id.* According to

LaFleur's World Lottery Almanac, plaintiff SGI holds over 70 percent market share domestically for this type of business. *Id.* ¶ 14. It is also the primary ticket supplier for 9 out of the 10 most successful lotteries in the United States. *Id.* One of SGI's main competitors, International Gaming Technology PLC ("IGT"), possesses a corresponding 12 percent market share in instant products. *Id.* ¶¶ 12, 14.[1]

Defendant Brian Keith Cash was first hired by plaintiff as an ink jet technician in 1993. (Def.'s Ex. 16, Cash Decl. ¶ 6.) After two years, Cash left for a short period but returned within six months. *Id.* ¶ 7. Upon returning, defendant assumed the role of a production control representative. *Id.* Thereafter, he held a number of other positions within the company, eventually culminating in Vice President of U.S. Sales in 2013 and Vice President of Global CSP Services in 2014. *Id.* ¶ 8. The Cooperative Services Program, referred to as CSP, is an additional instant product service offered by plaintiff, wherein it provides warehousing and distribution for an instant lottery. *Id.* ¶ 12. As vice president of this operation, defendant was responsible for overseeing eleven active CSP customers and assisting the sales department on procuring seven other potential target states. *Id.* ¶ 15.

---

[1] While not focusing its business as much on instant products, IGT appears to possess a substantial majority of systems work in the United States.

During his time with plaintiff, Cash was exposed to various proprietary software and hardware systems created by plaintiff and its employees. While he admits that he was familiar with and proficient at using these systems in the course of his work, he denies any special technical knowledge or role in developing them. *Id.* ¶¶ 22, 62, 79. He also claims that most, if not all, of the accumulated information contained in these programs is updated frequently and that it would likely be irrelevant now. *Id.* ¶¶ 63–67.

In 2009, after becoming Vice President of U.S. Sales, Cash was required to sign an employment contract containing several restrictive covenants, including confidentiality, noncompete, and nonsolicitation provisions. *Id.* ¶ 11; Def.'s Ex. 9. First, the agreement provides that Cash will maintain the confidentiality of company information and trade secrets for a period of three years following termination of his employment. (Def.'s Ex. 9.) Second, he agrees not to accept a substantially similar position with a competitor located in the United States for a period of six months post-termination. *Id.* Finally, he agrees not to solicit customers of SGI contacted within the last two years of his employment for a period of one year following his employment. *Id.* Cash was not asked to sign any new agreements upon subsequent job promotions. *Id.* ¶ 14.

After his last promotion, Cash's relationship with his company superior, John Schulz, began to deteriorate. ¶ 26–29. Schulz had previously served in Cash's position as Vice President of Global CSP Services. When this turmoil developed, an opportunity for Cash to go work for one of plaintiff's competitors, IGT, presented itself. *Id.* ¶ 31. Discussions with IGT were facilitated primarily through Mike Chambrello,[2] Connie Laverty O'Connor, and Lisa DeFruscio early in the summer of 2015. *Id.* Around this time, Cash met with the Executive Vice President and CEO of SGI's Lottery Group, James Kennedy, to discuss his career struggles and seek reassurance about his role with the company. *Id.*; *see also* Schulz Decl. ¶ 2. Cash disclosed the IGT opportunity to Kennedy at this meeting but ultimately decided he was not ready to leave SGI. (Def.'s Ex. 16, Cash Decl. ¶ 31.)

In January 2016, SGI was awarded a service contract from the North Carolina Education Lottery. *Id.* ¶ 33. Since Cash played a significant role in this bid, there was some discussion of his relocating to Raleigh to serve as an on-site representative for the company. As the plan developed, however, it became apparent to Cash that the move would not benefit his career at SGI. With continuing strain on his relationship with Schulz, Cash once again began contemplating a position with IGT. *Id.* ¶ 34.

[2] Mike Chambrello was previously the Chief Executive Officer of SGI's instant lottery program. He now serves as the CEO of North America Lottery at IGT. (Def.'s Ex. 16, Cash Decl. ¶ 112.)

At an industry conference in April, Cash ran into Connie Laverty O'Connor from IGT. There, she indicated that the opportunity at IGT may still be available for him. *Id.* ¶ 35. Cash and his wife, Fran—who was then a Regional Vice President of Sales at SGI—had dinner with O'Connor on May 10, 2016, in Atlanta. (Pl.'s Ex. 406, Cash Dep. 81:9–14.) A few days later, in preparing for the position, Cash also booked a flight to Lakeland, Florida, to see IGT's printing headquarters. (Pl.'s Ex. 310; Pl.'s Ex. 406, Cash Dep. 92:16–25; *see* Pl.'s Ex. 404, O'Connor Dep. 90:23–25.) Thereafter, Cash was in contact with Lisa DeFruscio via email about a formalized job offer. (*See* Def.'s Exs. 2–4.) Based on email communication between O'Connor and Mike Chambrello, IGT appeared interested in procuring Cash to awaken the "sleeping giant in the Predictive ordering and distribution area." (Pl.'s Ex. 310; *see* Pl.'s Ex. 404, O'Connor Dep. 96:19–23.) On May 29, Cash received an offer letter from IGT dated May 22. (Def.'s Ex. 16, Cash Decl. ¶ 37; *see also* Def.'s Ex. 4.) During this time period, Cash continued to participate in high-level confidential meetings with SGI executives. (Pl.'s Ex. 407, Schulz Decl. ¶¶ 112, 116–20.)

Cash planned to resign on June 10 and, to put SGI on notice, scheduled meetings with both John Schulz and James Kennedy. *Id.* ¶ 38. Cash provided them each with a resignation letter that stated his willingness to work a 60-day notice period as needed. (Pl.'s Ex. 314.) It also stated that he understood, given the nature of the

business, if plaintiff preferred that he not continue working there. *Id.* John Schulz claims that Cash clearly anticipated being fired, as he had spent the better part of his last day cleaning out his office. (Pl.'s Ex. 407, Schulz Decl. ¶ 25.) Moreover, the next day, Cash sent an email to Lisa DeFruscio that remarked, "[a]s I expected, the company declined my offer to work through a transition period." (Pl.'s Ex. 315.)

A few days after Cash left SGI, it was discovered that his wife and he had downloaded large amounts of electronic files from their laptop computers shortly before departing the company.[3] Cash admits that he did not tell anyone he had downloaded the files and that he did not get permission from any of his superiors. (Pl.'s Ex. 406, Cash Dep. 122:1–25; *see also* Schulz Decl. ¶ 9.) Despite having the hard drive in his possession when he was terminated, Cash did not mention his downloads even from that morning. (Pl.'s Ex. 406, Cash Dep. 123.) Along with the larger narrative, the parties have stipulated to the following facts in evidence:

> -On August 5, 2015, Cash knowingly downloaded not fewer than 4,137 electronic files from the laptop issued to him by plaintiff to a certain portable external hard drive. (Stipulations of Fact ¶ 1, ECF No. 83.)
>
> -He knowingly downloaded another 35,457 files from the same laptop to the same hard drive on May 25, 2016. *Id.* ¶ 3.
>
> -On June 10, 2016, the day he resigned, Cash downloaded at least 254 more files onto the hard drive that morning. *Id.* ¶ 5.

---

[3] Alleged downloads by Mrs. Cash are the subject of other litigation in this court. ¶ 114.

-Of the files downloaded on each occasion, a majority related to the business and affairs of plaintiff, and a number of them constituted or contained trade secrets belonging to plaintiff. *Id.* ¶¶ 2, 4, 6.

-The files downloaded included strategic bid information, account plans, finance and supply-chain documents, and data compilations. *See id.* ¶ 7.

-There is no electronic evidence on the hard drive that Cash opened, accessed, read, used, transferred, or reviewed any file on the drive after he transferred them to the drive or left SGI on June 10, 2016. *Id.* ¶ 11.

-There is also no presently-available admissible evidence known to SGI that Cash disclosed any info on the hard drive to IGT or any other competitor. *Id.* ¶ 13.

At 4:02 p.m. on June 16, Cash received an email with a letter attachment from SGI's in-house counsel, Chris Jones, demanding that the files his wife and he had downloaded to the external hard drives be returned by 2:00 p.m. the following day. (Def.'s Ex. 16, Cash Decl. ¶ 47; *see also* Pl.'s Ex. 316.) Cash complied with this demand. (Def.'s Ex. 13, Cash Dep. 48:1–20; *see also* Stipulation of Facts ¶ 9.) He admits, however, that prior to this demand, he did not intend to return the files. (Pl.'s Ex. 406, Cash Dep. 123:8–18.) He further admits that he knew there were marked subfolders containing personal information on his laptop and that, albeit more time consuming, he could have taken these folders separately. *Id.* at 148–49.

In explaining the downloads, Cash does not recall any incident on August 5, 2015. He contends that the May 25, 2016, download occurred as a result of an unusual email he received from John Schulz's personal email account the night before.

(Def.'s Ex. 16, Cash Decl. ¶ 48; Pl.'s Ex. 406, Cash Dep. 149–50.) The email requested an early morning meeting and told Cash to come in regardless of whether others were in the office. (Pl.'s Ex. 406, Cash Dep. 149–50.) Cash feared that he might be fired for his having contacted IGT about employment opportunities. *Id.* at 149:25. On June 10, Cash downloaded files from his desktop that had been added since May 25. (Def.'s Ex. 16, Cash Decl. ¶ 50.) Cash claims that the files were interspersed with his personal information and that he had witnessed the company's poor handling of such information post-employment. *Id.* ¶ 51. He purportedly intended to use the hard drive during any transition period that he might continue working for SGI. He also claims that SGI's Information Technology Department recommended using external hard drives to back up company-supplied computers. *Id.* ¶ 55.

Plaintiff filed suit on June 22, 2016, seeking damages and injunctive relief. To this date, Cash has honored the noncompete provision contained in his employment agreement. However, he seeks to begin working for IGT in early January 2017 when his 6-month limitation lapses. On November 3, Lisa DeFruscio drafted a letter to Cash about his ongoing duties to SGI and the responsibilities he will have and will not have at IGT. (Def.'s Ex. 7.) On November 17 and 18, 2016, the court heard argument on plaintiff's motion for preliminary injunction. There, the parties

offered extensive evidence on plaintiff's trade secrets and company inner workings. More specifically, the court heard evidence from both parties about Cash's role with the company and the knowledge he may have acquired in that capacity.

## III. Preliminary Injunction

A party seeking preliminary injunction must establish the following four elements: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Lebon v. Sec'y, Fla. Dep't of Children and Families*, 710 F.3d 1202, 1206 (11th Cir. 2013) (citation omitted). A preliminary injunction is an "extraordinary and drastic" remedy to be granted only when movant clearly carries its burden of persuasion as to the four elements. *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1518 (11th Cir. 1983) (citation and internal quotations omitted). For the reasons that follow, the court finds that plaintiff has met its burden.

### A. Substantial Likelihood of Success on the Merits

Under the Georgia Trade Secrets Act ("GTSA"), a court may grant an injunction for "[a]ctual or threatened misappropriation" of trade secrets. O.C.G.A. § 10-1-762(a); *see also id.* ("[T]he injunction may be continued for an additional

reasonable period of time in appropriate circumstances for reasons including . . . an elimination of commercial advantage that otherwise would be derived from the misappropriation . . . ."). Misappropriation can include "[a]cquisition of a trade secret . . . by improper means." § 10-1-762(2). Improper means are defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." § 10-1-761(1). At the evidentiary hearing, plaintiff relied on two theories of misappropriation: defendant's past downloading conduct and the future threat of his disclosure. The court will address each theory in turn.

**1. Defendant's Past Conduct**

Even by stipulated facts alone, plaintiff has stated a claim for misappropriation based on defendant's past conduct. Cash admits that he downloaded company files and that at least some of those files constituted or contained trade secrets. (*See* Stipulations of Fact ¶¶ 2, 4, 6.) Defendant was not entitled to leave plaintiff's employ in possession of its trade secrets. *See Avnet, Inc. v. Wyle Labs., Inc.*, 263 Ga. 615, 618 (1993) ("Trade secrets are *the property of the employer* and cannot be *taken* or used by the employee for his own benefit . . . ." (some emphasis added)). Although SGI granted him access to documents and information in his role with the company, he was required to return these items upon termination. Here, he chose not to do so.

Retention of these files likely amounted to either a theft or a violation of his duty of secrecy to the company. *See* O.C.G.A. § 10-1-761(1). And although the court lacks evidence at this stage as to whether anything left these external drives, it is imperative that this interest be protected.[4] Had plaintiff not demanded that Cash return the files, he would likely still have them in his possession and free for use at his new job with IGT.

What is more, defendant's downloads strongly coincided with discussions about opportunities at IGT. In fact, the only times defendant downloaded anything onto these drives was shortly before or after discussing employment opportunities with the competitor. More damning still, Cash continued to attend high-level confidential meetings while entertaining this new position. The court recognizes that he was in a difficult situation between career paths but it does not excuse this behavior or misuse of his company's property. Although he argues that his personal information was interspersed in the laptop files, he does acknowledge that the main folder had separate subfolders with particular designations and that it would not have been impossible to extract his personal files rather than transfer them wholesale.

---

[4] It is not clear from the evidence, and certainly not from the parties' stipulations, whether external hard drives have the *capacity* to create logs or track activities such as copying or distribution of files to another computer.

Cash never sought permission to download or retain company files, and he gave no notice of having done so the day he resigned. Despite a seemingly clear expectation of being terminated, Cash retained an enormous amount of important trade secret documents on a personal hard drive. Cash contends that he intended to use files during any transition period that SGI might allow. Yet, this justification remains unpersuasive. Not only did Cash fail to return the files after learning that he would not work a transition period but also he appeared to have secure remote access to SGI's servers where the same files could be backed up or existed independently. (*See* Pl.'s Ex. 407, Schulz Decl. ¶ 9.) Cash contends that this was one of the most important and difficult decisions of his life, and yet he spent what appears to be only minutes planning his technological separation from the company.

The court can reach no other conclusion from this conduct. Thus, it finds that plaintiff has shown a likelihood of success on the merits for its misappropriation claim based on defendant's downloading activities.

**2. Inevitable Disclosure**

In Georgia, the inevitable disclosure doctrine as applied to the misappropriation of trade secrets is limited. *See, e.g., Holton v. Physician Oncology Servs., LP*, 292 Ga. 864, 870 (2013). In *Holton*, the Georgia Supreme Court held that "the inevitable disclosure doctrine is not an independent claim under which a trial court may enjoin

an employee from working for an employer or disclosing trade secrets." *Id.* A court may not base a claim for relief under the GTSA solely on the risk of future disclosures. *See id.* Unfortunately for defendant, this case is not so limited in evidentiary basis. It is well established that defendant took thousands of electronic files from his employer before resigning from the company. His knowledge of company trade secrets and any information he may have retained from downloaded files are merely additional evidence in support of injunctive relief. Defendant's past conduct creates a concern for what he might do in the future. Plaintiff has shown an actual misappropriation but also seeks protection against future threats. Thus, while not an independent claim, evidence of defendant's knowledge of SGI trade secrets, coupled with his surreptitious downloading of trade secret files, still weighs in support of granting an injunction. *See id.*

**B. Irreparable Harm**

Plaintiff has established irreparable harm through both defendant's actual and threatened misappropriation of company trade secrets. Although the stipulations of fact seem to suggest that defendant has returned plaintiff's files and did not use or disclose them, the court has strong reservations about concluding the same. Having no "electronic evidence on the hard drive" that defendant used or transferred files and

no "presently-available admissible evidence" that he disclosed info to IGT is not the same as affirmatively saying that he did not. (*See* Stipulations of Fact ¶ 11, 13.)

Further, based on evidence presented at the hearing, defendant was privy to numerous company systems, technologies, and strategies. Although he attempted to cast himself in a somewhat naive light, the court is convinced that defendant is a very intelligent individual and an expert in his field. He carries intimate knowledge of SGI's trade secrets and could likely use them against the company if he is allowed to work for IGT. In particular, Cash could use his special knowledge to secure upcoming lottery contracts against SGI, which would have a lasting effect on the company's reputation and market standing. *See Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc.*, 793 F. Supp. 2d 1302, 1313–14 (N.D. Ga. 2011). The threat of defendant's engaging in such unfair competition is amplified by his having downloaded so many of the company's files just before departing. As this court recently held, such a threat of improperly using confidential information may constitute an irreparable harm. *See Cellairis Franchise Inc. v. Duarte*, No. 2:15-cv-00101-WCO, 2015 WL 6517487, at *8 (N.D. Ga. Oct. 21, 2015). The court finds that same concern to apply to the present case.

### C. Balance of Harms

As discussed above, plaintiff would suffer irreparable harm from any disclosure of its trade secrets by defendant. Plaintiff has a legitimate interest in operating its business without unfair competition and disclosure of its trade secrets. Such is the status quo ante in this case. While the court is sympathetic that an injunction would effectively preclude Cash from working in an industry where he has made his career, it is a difficult situation that he has created. *See Amedisys Holding*, *LLC.*, 793 F. Supp. 2d at 1313–14 (N.D. Ga. 2011) ("[Defendant] . . . 'cannot suffer compensable harm when enjoined from an unlawful activity.'" (quoting Specialty Chem. & Servs., Inc. v. Chandler, No. 1:87-cv-2338-MHS, 1988 WL 618582, at *4 (N.D. Ga. Sept. 29, 1988))).

### D. Public Interest

There is a strong public policy in favor of protecting trade secrets from misappropriation and in promoting fair competition. *See Priority Payment Sys., LLC v. Signapay*, *LTD*, 161 F. Supp. 3d 1294, 1304 (N.D. Ga. 2016). The public interest weighs in favor of granting a preliminary injunction.

### E. Scope of the Injunction

In conclusion, the plaintiff has met its burden, and the court will enjoin Cash from working for SGI's competitors.[5] The question now is the scope of that injunction. It appears that Cash has acted in good faith since returning the files to SGI and has honored the 6-month noncompete provision from his employment agreement.[6] However, there was a lot of room for improvement in the approach he took when leaving the company. He could have better identified and extracted his personal information if that was indeed his only motive for downloading files to the hard drive. The volume of information he took was staggering, and it had the potential to cause grave harm if it fell into the hands of SGI's competitors. He also could have been more forthcoming about his opportunities at IGT and even elected not to attend certain meetings out of respect for the company. He did neither of these things.

At the hearing, plaintiff sought an injunction against defendant from working for its two main competitors, IGT and Pollard Banknote Limited, for a period of two years. In response, defendant contended that an extremely narrow injunction against certain state contract bids, if at all, would be more appropriate. Plaintiff has

---

[5] The court will not require a security bond in this case. Defendant made no argument to the contrary in his brief, and the court is confident that plaintiff could satisfy any potential judgment out of a wrongful injunction. *See AT&T Mobility LLC v. Nat'l Ass'n for Stock Car Auto Racing*, 487 F. Supp. 2d 1370, 1382 (N.D. Ga. 2007), *rev'd on other grounds*, 494 F.3d 1356 (11th Cir. 2007).

[6] As of January 1, 2017, this provision expired.

requested an overly broad injunction based on the facts of this case. However, the court finds it difficult to parse out more narrow limitations that would not evade enforcement. Out of an abundance of caution, the court will enjoin defendant Cash from working for the named competitors for just over a year. This will provide ample time for SGI to protect the interests it discussed at the hearing.

## IV. Protective Order

Prior to the motion for preliminary injunction, the plaintiff moved for entry of a protective order in this case. For purposes of the hearing on the motion for preliminary injunction, defendant consented to a working protective order on documents disclosed therein. Going forward, the court must still rule on this issue. It seems that the parties generally agree that a protective order is appropriate in this case. However, there is a dispute as to whether plaintiff may designate certain documents as "Highly Confidential - Attorneys' Eyes Only," a provision which, clearly, would prevent defendant from viewing them.

Plaintiff argues that defendant's objection to such a designation is premature and that its proposed protective order would provide a mechanism for defendant to challenge any designations on a document-by-document basis. (Mot. for Protective Order 6–7, ECF No. 58.) Plaintiff also argues that defendant should not get a chance to refresh his memory on documents that he, as plaintiff claims, has already tried to

steal once.[7] In response, defendant argues that he should be able to view the alleged trade secret documents in this case in order to prepare a defense. (Resp. to Mot. for Protective Order, ECF No. 64.) He also points out that there is no limiting language in plaintiff's proposed order that will allow only trade secrets to be designated or that will require plaintiff to allow defendant's review of any document(s) implicated in plaintiff's disclosure claims. While most of defendant's arguments pertain to his defense in preparation of the preliminary injunction hearing, the court must still decide this issue going forward.

Under Federal Rule of Civil Procedure 26, "[t]he court may, for *good cause*, issue an order to protect a party or person from annoyance, embarassment, oppression, or undue burden or expense, including . . . (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . . ." FED. R. CIV. P. 26(c)(1). Similar relief is permitted under the Georgia Trade Secrets Act. *See* O.C.G.A. § 10-1-765 ("In an action under this article, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings . . . .").

[7] The court notes that if plaintiff's allegation is that this information is already in defendant's mind or possession, disclosure here is relatively harmless. If plaintiff concedes that it is not, then the gravity of its claims, at least on the issue of inevitable disclosure, is dampened significantly.

As stated above, both parties appear to agree that a protective order is appropriate. They disagree only as to whether defendant should be permitted to view any documents designated "Highly Confidential - Attorneys' Eyes Only." After hearing evidence on plaintiff's preliminary injunction motion, the court is convinced that there is no harm from defendant's viewing documents in preparation of a defense going forward. However, proper measures must also be taken to secure plaintiff's trade secrets. As such, defense counsel must show plaintiff's counsel any documents designated "Highly Confidential - Attorneys' Eyes Only" that they intend to show defendant before they are shown to defendant. If plaintiff takes particular issue with any document, the court may address it at that time by proper motion. Defendant may not take notes about the document and may not maintain a copy after his review. (*See* Ex. A to Resp. to Mot. for Protective Order 3, ECF No. 64-1.)

## V. Conclusion

In conclusion, plaintiff's motion for protective order is hereby **GRANTED in part** consistent with this order. Plaintiff's motion for preliminary injunction is also hereby **GRANTED**.

Defendant Brian Keith Cash, his agents, servants, employees, attorneys, and all other persons who are in active concert or participation with him, are hereby

**ENJOINED** from working for International Game Technology PLC or Pollard Banknote Limited, or any subsidiary companies of either, until January 31, 2018.

IT IS SO ORDERED, this 25th day of January, 2017.

s/*William C. O'Kelley*
William C. O'Kelley
Senior United States District Judge